**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EVA B.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20 C 2689** |
| **v.** | ) | |
| | ) | **Magistrate Judge Gabriel A. Fuentes** |
| **KILOLO KIJAKAZI, Acting** | ) | |
| **Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court are Plaintiff Eva B.'s[2] motion for summary judgment seeking remand of the final decision of the Commissioner denying her Disability Insurance Benefits ("DIB") (D.E. 17), as well as the Commissioner's cross-motion to affirm the decision. (D.E. 24.) This matter is before the magistrate judge for all purposes, per the parties' joint consent to magistrate judge jurisdiction. (D.E. 7, 8); 28 U.S.C. § 636(c). On March 18, 2020, the Appeals Council denied Plaintiff's request for review rendering the ALJ's decision as a final decision of the Commissioner. (R. 1.)

# I. ADMINISTRATIVE RECORD

### A. Medical Evidence

Eva B. ("Plaintiff" or "Eva") has narcolepsy with cataplexy, [3] obesity, and mild obstructive

---

[1] The Court substitutes the current Commissioner, Kilolo Kijakazi, for predecessor Andrew Saul as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court.

[3] Cataplexy is "attacks of loss of muscle tone, sometimes with actual collapse, during which the individual always remains conscious." SSA POMS DI 24580.005, Evaluation of Narcolepsy, Part A1, available at https://secure.ssa.gov/poms.nsf/lnx/0424580005.

sleep apnea.[4]  Plaintiff contends that her impairments prevented her from working on June 15, 2017, her alleged onset date ("AOD").  Plaintiff's date last insured ("DLI") was December 31, 2021. (R. 15.)

According to Plaintiff's treating physician, Dr. Hrayr Attarian, Plaintiff was diagnosed with narcolepsy in 1998 following a Multi-Sleep Latency Test ("MSLT"), which was characterized by "excessive daytime sleepiness" and the "irresistible urge to fall asleep even in appropriate [sic] situations." (R. 408.)[5]

According to the medical evidence in the record, Plaintiff presented to Dr. Alison Weiss and Dr. Attarian at the Northwestern Medicine Neurology Sleep Program on June 19, 2017, for a follow up visit for narcolepsy with cataplexy.  (R. 354.)  At that visit, Plaintiff reported "not doing well" and "dozing multiple times a day," and no longer being able to be a teacher "because she is not present with the kids '100% of the time.'"  (Id.)  Plaintiff reported on that day that the cataplexy was under control.  (Id.)  At that time, Plaintiff was taking clomipramine for cataplexy and modafinil for narcolepsy but reported still "dozing off multiple times a day" and being unable to work as a result.  (R. 355-56.)  According to Dr. Attarian's notes from the visit, Plaintiff was "tearful that she nods off at work and is both embarrassed and concerned about her ability to do a good job under the circumstances."  (R. 356.)  At the visit, Drs. Weiss and Attarian recommended continuing the clomipramine and modafinil and starting use of methylphenidate when Plaintiff felt most tired and "not to drive when sleepy."  (R. 355-356.)

---

[4] The ALJ also found that Plaintiff suffers from lumbar spondylosis, which was not one of the bases for Plaintiff's disability claim.

[5] Dr. Attarian provided this information as part of Plaintiff's Social Security disability claim denial in a letter dated September 21, 2017.

On October 18, 2017, Plaintiff presented to Dr. Ashima Synghal Sahni and Dr. Attarian at the Northwestern Sleep Program. (R. 362.) During that appointment, Plaintiff reported continued excessive daytime sleepiness ("EDS") and cataplexy that were not responding well to Plaintiff's medication regimen and that methylphenidate (also known as Ritalin) produced "jitteriness." (R. 362.) Dr. Sahni also noted that Plaintiff reported feeling jittery while on Ritalin; that Plaintiff continued to have cataplexy two to three times per month, but that it was "better than before;" that Plaintiff "continues to have sleep attacks very so often [sic];" and that Plaintiff was still driving although also experiencing sleep paralysis, while Plaintiff denied having sleep hallucinations. (R. 362.) Dr. Sahni also noted that Plaintiff was taking a nap in the afternoon. (R. 362.) Noting that Plaintiff's narcolepsy was not controlled with modafinil and that Plaintiff continued to experience sleep attacks, sleep paralysis, and cataplexy, Dr. Attarian and Dr. Sahni prescribed that Plaintiff stop the Ritalin and begin taking sodium oxybate (also known as Xyrem), and to stop clomipramine once she was on a stable dose of Xyrem. (R. 362, 364-5.) The doctors instructed Plaintiff not to take the Xyrem while putting her child to bed. (R. 365.)

Dr. Attarian completed a Residual Functional Capacity Questionnaire in October 2017. (R. 403- 407.) In that questionnaire, Dr. Attarian opined that Plaintiff suffered from narcolepsy and cataplexy and experienced hypnagogic hallucinations[6] and sleep paralysis, malaise, daytime sleepiness, problems with concentration, micro sleep, and rapid entry into REM sleep. (R. 403). Dr. Attarian stated that Plaintiff had at least one event of narcolepsy with cataplexy for three

---

[6] Hypnagogic hallucinations are hallucinations that occur between sleep and waking. Program Operations Manual System ("POMS") DI 24580.005, Evaluation of Narcolepsy, available at https://secure.ssa.gov/poms.nsf/lnx/0424580005. POMS is a handbook for internal use by employees of the Social Security Administration. *Parker for Lamon v. Sullivan*, 891 F.2d 185, 189-190, n.4 (7th Cir. 1989).

consecutive months while following the prescribed treatment. (R. 403.) The doctor also noted that Plaintiff's narcolepsy events occurred several times per day and lasted a few seconds to a few hours. (R. 404.) Using an assessment tool known as the Epworth Sleepiness Scale ("ESS"), Dr. Attarian assessed Plaintiff as having a slight chance of dozing while speaking to someone; a moderate chance of dozing while sitting and reading, watching tv, or sitting inactive in public; and a high chance of dozing while being a passenger in a vehicle for an hour, lying down in the afternoon, sitting quietly after lunch, or stopped a few minutes in traffic while driving. (R. 404.) According to Dr. Attarian's assessment, laughing, crying, loss of sleep, or stress were all triggers for Plaintiff's narcolepsy, and naps and medication improved her condition. (R. 404-05.) Dr. Attarian concluded that Plaintiff would be precluded from performing basic work activities and would need "a few" unscheduled breaks daily for 20 to 30 minutes to allow Plaintiff to nap. (R. 405.) Dr. Attarian estimated that Plaintiff would be absent from work more than four times a month due to narcolepsy. (R. 406.)

At a February 5, 2018, follow-up appointment with Drs. Sahni and Attarian, Plaintiff reported that EDS and cataplexy were "well controlled on current regimen." (R. 359.) Dr. Sahni noted that Plaintiff's symptoms were "controlled on modafinil and xyrem." (R. 381.) Dr. Attarian noted that "[s]he is trying to get pregnant." (R. 359.) Because of that, Dr. Attarian recommended that Plaintiff not take medication in the first trimester; resume modafinil in the second and third trimesters; follow up carefully during what would be a high-risk pregnancy; take fluoxetine while pregnant for cataplexy; and resume sodium oxybate when Plaintiff was done with pregnancy. (R. 359). Dr. Sahni noted that Plaintiff had been started on Xyrem (sodium oxybate) and "felt much better;" that Plaintiff's "sleep attacks and cataplexy are better controlled;" that Plaintiff "quit her job and feels better;" and is "considering to get pregnant [sic]" and "wants to consider the

4

management options." (R. 359, 381.) Dr. Sahni advised Plaintiff to schedule home sleep apnea testing, noting that Plaintiff did not have observed sleep apneas but was snoring and had recently gained weight, and that undiagnosed sleep apnea might contribute to Plaintiff's sleepiness. (R. 359, 381.) Dr. Sahni advised that Plaintiff should stop modafinil and Xyrem while trying to conceive, to restart medications if Plaintiff did not conceive, and to return to the office to start fluoxetine for pregnancy if Plaintiff did conceive. (R. 359.)

Plaintiff again presented to doctors at Northwestern on May 14, 2018. (R. 386.) At that visit, Plaintiff's body mass index ("BMI") was 37.94 kg, and Plaintiff was assessed as an "obese woman in no distress" with no gross neurological deficits and a normal gait. (R. 387-8.) Plaintiff's chart indicated weight gain, continued snoring, and multiple wakings each night, but no diagnosed sleep apnea, as Plaintiff had not yet begun testing for sleep apnea – a factor which could be adding to Plaintiff's EDS. (R. 387.) Plaintiff reported feeling much better on Xyrem, describing the sleepiness and cataplexy as well-controlled, and stating that Plaintiff needed no medication during the day. (R. 386.) However, Plaintiff was "trying to conceive and trying not to take the Xyrem on the two weeks between ovulation and her period," and instead took modafinil in the morning and Ritalin in the afternoon. (R. 386.) Plaintiff's medical team noted that "she is trying to conceive" but also that "her reality is that as part of her faith, she does not believe in using contraception, so there will always be the potential for pregnancy." (R. 388.) As a result, Plaintiff was "off xyrem and very sleepy" with an ESS of 20 and had experienced multiple episodes of cataplexy, including one the week of Plaintiff's medical visit.[7] (R. 386-7.) Dr. Innessa Donskoy

---

[7] For reference, here is Plaintiff's Epworth Sleepiness Scale test from that visit:
**Epworth sleepiness scale score**
    O= No chance of dozing
    1 = Slight chance of dozing
    2= Moderate chance of dozing
    3= High chance of dozing

noted that the risk of taking Xyrem in early pregnancy was unknown, but because it had a short half-life, it could be easily discontinued once Plaintiff confirmed that she was pregnant; accordingly, because Plaintiff's sleepiness and cataplexy were best controlled with the Xyrem, it was "reasonable for her to continue [Xyrem] until she has conceived." (R. 387.) At the time, Plaintiff's son was 3 years old, and Plaintiff's in-laws were helping her to care for the boy. (R. 386.) Plaintiff reported to the doctors that she was still driving, but for no more than 15 minutes in either direction. (R. 386.) Drs. Donskoy and Margaret Kay-Stacey instructed Plaintiff to continue Xyrem until conception, to discontinue modafinil and Ritalin while taking Xyrem, and to notify the sleep clinic upon becoming pregnant. (R. 387-88.) The doctors again instructed Plaintiff to see a high-risk obstetrician if she was pregnant, not to drive due to Plaintiff's high sleepiness score, and to return to Dr. Attarian in three months. (R. 388.)

In August 2018, Plaintiff completed an unattended overnight polysomnogram and diagnosed with a mild obstructive sleep apnea/hypopnea. (R. 398.) According to Plaintiff's medical records from Northwestern, at the time of the polysomnogram, Plaintiff's ESS was a 22 and she reported daytime sleepiness, difficulty staying asleep, hypnagogic hallucinations, hypnopompic hallucinations, sleep paralysis, and cataplexy. (R. 398.)

---

**Situation**
    3 Sitting and reading
    2 Watching TV
    3 Sitting inactive in a public place
    3 As a passenger in a car driving for over an hour
    3 Lying down to rest in the afternoon if circumstances permit
    1 Sitting and talking to someone
    3 Sitting quietly after a lunch without alcohol
    2 Driving and the car stops for a few minutes
**Total score: 20**

During a September 12, 2018, Northwestern visit, Dr. Attarian noted that Plaintiff's sleepiness was "partially controlled," that Plaintiff "does not like taking sodium oxybate because it knocks her out," that "clomipramine controls her cataplexy," and that Plaintiff wanted to go back on modafinil. (R. 420.) At the visit, Plaintiff had a BMI of 38.77 and an ESS of 12.[8] (R. 420-21.) Dr. Attarian instructed Plaintiff to stop taking Xyrem, to continue clomipramine, to temporarily restart modafinil, to continue taking Ritalin, and to enroll in a pitolisant study.[9] (R. 421.)

At an October 4, 2018, visit, Plaintiff's ESS was 22. (R. 430.) At the time, Plaintiff was taking clomipramine, methylphenidate and modafinil. (R. 430.) Dr. Attarian instructed Plaintiff to begin pitolisant, taper off Ritalin over six weeks, continue modafinil, stop clomipramine seven days before starting pitolisant, and take a pregnancy test. (R. 431.)

At a January 11, 2019, visit, Dr. Attarian noted that Plaintiff was "doing much better during the day with pitolisant alone. She is still needing to nap and tends to fall asleep during the day when sedentary but overall is more alert." (R. 445.) Plaintiff had an ESS of 12 and a BMI of 34.95 kg, with no change in weight. (R. 445.) Dr. Attarian and clinical psychologist Dr. Jennifer Mundt noted that Plaintiff had difficulty staying asleep at night, coincidental to Plaintiff's having begun to take the weight-loss medication phentermine, and that Plaintiff's cataplexy was controlled. (R. 445, 450.) Plaintiff reported napping occasionally in the morning, napping most afternoons for 90 to 120 minutes, and napping approximately three times each week for 60 to 90

---

[8] It appears from the medical records that this may have been inaccurate: one of the lines of the test stated "0=high chance of dozing Driving and the car stops for a few minutes." The other line items for which a "high chance" was reported were each given three points, whereas "0" was assigned to items for which Plaintiff reported "no chance of dozing." Accordingly, the properly calculated ESS on this date was likely 15. (R. 420-21.)

[9] Pitolisant is a narcolepsy drug that was the subject of trials at that point in Plaintiff's care.

minutes at 7 p.m. (R. 450-51.) Dr. Mundt noted that Plaintiff was appropriately dressed and groomed, alert and engaged; with a slightly tangential but logical thought process; and that in addition to Plaintiff's narcolepsy diagnosis, Plaintiff had signs and symptoms consistent with insomnia disorder. (R. 452.) Dr. Mundt recommended that Plaintiff begin cognitive behavioral therapy to help improve sleep efficiency. (R. 451-2.) Dr. Attarian instructed Plaintiff to continue pitolisant, continue napping, begin cognitive behavioral therapy for insomnia, consider introducing modafinil in the afternoon, and to practice good sleep hygiene. (R. 446.)

**B.      Hearing**

At the April 25, 2019, hearing, Plaintiff described her condition as "difficult," saying that her brain would fall asleep first and she wouldn't know what she was doing, followed by her eyes closing. (R. 52-53.) Plaintiff did not know when these episodes would occur. (*Id.*) Plaintiff described the episodes as thinking that she was awake even when she was not awake, and that she would end up doing something she didn't realize that she was doing. (R. 54.) Plaintiff likened the attacks to when a person is in bed, getting ready to fall asleep, but is in and out of sleep. (R. 58.) Plaintiff experienced sleep paralysis, which is the inability to move while drifting in and out of sleep; and sudden loss of muscle strength due to cataplexy, causing a fall as a result. (R. 58.) Reading, watching television, or sitting as a passenger in a car would all trigger Plaintiff to fall asleep. (R. 58-59.)

Plaintiff testified that she cared for her son with the assistance of her mother and mother-in-law, because Plaintiff needed to nap during the day, and that Plaintiff did not cook or clean at home. (R. 37, 55-56.) In the prior two years, Plaintiff traveled to Michigan for a baptism and for a funeral, and both times a family member drove her. (R. 56.) Plaintiff estimated her number of daily naps at three to four, for an average of 45 minutes each time, and denied that the daytime

naps were causing insomnia. (R. 54.) Plaintiff's main nap was somewhere between 2 and 5 p.m. (R. 55.) Plaintiff did not have hobbies, exercise or visits with family or friends. (R. 57.)

Plaintiff testified that she was not "trying" to have another baby but was not taking contraception, and thus, the "possibility [of pregnancy] is there." (R. 37-38.) Plaintiff testified to driving a car, but only to the grocery store, library, or church, and only three to four times per week. (R. 37-38.) Plaintiff reported, at the hearing, having a college degree in elementary education, but Plaintiff also reported having quit teaching after several years because of an inability to stay awake at times when being alert was necessary to the job. (R. 39.) Plaintiff also testified to being unable to go back to her prior job as a cleaner because she would fall asleep, and Plaintiff further testified to not having looked for any other jobs since being a teacher. (R. 52.) Plaintiff testified that exercise had not been recommended and caused sleepiness, but that the pitolisant, naps and behavioral sleep therapy were helping. (R. 52-53.)

Dr. Attarian also testified at the hearing. The doctor testified that he was a neurologist, board certified in neurology and sleep medicine, who had treated Plaintiff for narcolepsy and cataplexy for approximately three years. (R. 40-41.) Dr. Attarian opined that Plaintiff was not able to work until her condition was better controlled, because Plaintiff was unable to concentrate and suffered from daytime sleepiness, mental fogginess, difficulty staying awake while sedentary, extreme fatigue, and limitations in short-term memory. (R. 41-42.) In an eight-hour workday, Plaintiff would need multiple breaks. (R. 42.) Additionally, Dr. Attarian opined that Plaintiff's overall sleepiness and fatigue would limit Plaintiff every day, all day. (R. 43.)

According to Dr. Attarian, Plaintiff's sleep apnea and sleep hygiene were not factors in her symptom level. (R. 44.) Plaintiff's symptoms were improved "but not completely resolved" while taking pitolisant and modafinil. (R. 44.) Dr. Attarian also opined that Plaintiff's BMI at the time,

33.9, categorized her as obese, but that Plaintiff's obesity would not be the cause of nor an exacerbation of her fatigue symptoms: the doctor stated that Plaintiff's weight fluctuations were not consistent with changes in Plaintiff's levels of sleepiness during the three-year period in which she had been under the doctor's care. (R. 45-46.) Dr. Attarian testified that Plaintiff would not be able to perform a standing job because mental fog and fatigue were present, regardless of whether she was standing or sitting. (R. 46.) Dr. Attarian also testified to not telling Plaintiff to stop driving, because Plaintiff denied being sleepy while driving. Dr. Attarian testified that Plaintiff's fear of falling asleep while driving would be sufficient to keep Plaintiff from falling asleep during the short periods where she drove a car. (R. 47.)

Dr. Attarian testified that although Plaintiff's sleepiness was well-controlled while Plaintiff was on Xyrem, the doctor discontinued it because of side effects – that Plaintiff felt "knocked out" upon taking it. (R. 49.) Dr. Attarian denied that pregnancy-related issues were a reason to take Plaintiff off of Xyrem. (R. 49.) Dr. Attarian testified that even with pitolisant, weight loss, and behavioral therapy, at the time of the hearing, Plaintiff was not yet able to work. (R. 50.)

Next, Dr. Stephen Goldstein, a board-certified neurologist, testified as a medical expert. (R. 63-64.) Dr. Goldstein testified to being familiar with the Social Security listing, and to an opinion that Plaintiff had narcolepsy but did not meet or equal any listing or combination of listings. R. 63-64. Dr. Goldstein testified that even though he was "sure" that Plaintiff had mental fog and fatigue even when Plaintiff was not asleep, that there was "very little" in the record that indicated how severe those symptoms were and accordingly, Plaintiff could work a full-time job. (R. 65). Dr. Goldstein pointed to the mental status examination performed by Dr. Mundt to indicate that Plaintiff's speech volume and rhythm, mood and affect, and thought processes were

normal, and Plaintiff did not have suicidal or homicidal ideation or delusions. (R. 65.)[10] Dr. Goldstein specifically noted that Plaintiff's lowest ESS was a 12, and "was up to 20." (R. 66.)[11] Dr. Goldstein also noted that medications were changed "with her complaint, as opposed to any objective findings, any testing that was done." (R. 66, 68.) Dr. Goldstein also opined that it was "telling that she gets no exercise," because cardiovascular exercise might eliminate some insomnia by making Plaintiff "physically tired." (R. 66.) Dr. Goldstein described working as "something that she could do to keep her physically active, to keep her physically moving" and that a "physically stressful" job would be "beneficial," in that if Plaintiff became "conditioned enough," Plaintiff could do medium-level activities. (R. 67.) Dr. Goldstein opined that Plaintiff should not do sedentary tasks but also testified that the only reason Plaintiff could not climb ladders, ropes, scaffolds to high heights or operate hazardous machinery was because Plaintiff had lumbar spondylosis – Dr. Goldstein testified that "she's not going to fall asleep climbing a ladder. I mean, it's not going to happen." (R. 67-68.)

As part of Dr. Goldstein's testimony that Plaintiff did not meet or equal a listing, Dr. Goldstein testified that he "didn't see a listing, per se that . . . covered narcolepsy" and instead considered generally "[w]ould it be so severe to keep her from concentrating on the job? But I didn't see any physical listing to consider, really." (R. 71.) When Plaintiff's counsel informed Dr. Goldstein that POMS DI 24580.005 directed medical examiners to evaluate narcolepsy under Listing 11.02, which is for epilepsy, Goldstein indicated that he had not considered the listing. (R. 71.) Dr. Goldstein said that he did not see any documented sleep attacks in the record – only

---

[10] He also noted later in his testimony that "narcolepsy doesn't have the other mental symptoms, like delusions, and suicide, things like that. But we're talking about, basically, the ability to concentrate." (R. 69.)

[11] Dr. Goldstein referred to these ESS scores throughout his testimony. (R. 70, 72.)

"complaints," and that if Plaintiff was in fact "having uncontrolled sleep attacks, like you would say for 11.02, that she'd get an attack that would come all of a sudden and she were driving, she's going to end up in an accident at one time or another over several years." (R. 72.) Dr. Goldstein said that he did not agree or disagree with Dr. Attarian's assessments that Plaintiff would need multiple breaks during the workday and that she would likely miss more than four days per month due to her narcolepsy. (R. 72-73.)

Finally, a vocational expert ("VE") testified at the hearing. (R. 75.) When the ALJ provided a hypothetical that included the RFC that the ALJ ultimately assigned to Plaintiff, the VE testified that a person with that RFC could perform Plaintiff's past work as a teacher or cashier. (R. 76.) The VE also testified that a person with Plaintiff's RFC could work as a cleaner, mail clerk, fast food worker, hand packer, or "ball sorter." (R. 76.) However, the VE said, if Plaintiff required two breaks each day or missed four days per month, those limitations would preclude employment. (R. 76-77.)

C.    ALJ OPINION

After discussing the five-step process for determining disability, the ALJ found that as of Plaintiff's DLI of December 31, 2021, Plaintiff had the severe impairments of narcolepsy with cataplexy, obesity, mild obstructive sleep apnea ("OSA"), and lumbar spondylosis. (R. 15.) After explaining why none of the Plaintiff's impairments met a listing, the ALJ set Plaintiff's residual functional capacity ("RFC") as able to perform medium and light work, except that Plaintiff could not do sedentary work; could not climb ladders, ropes and scaffolds; and should avoid even moderate exposure to activities involving unprotected heights and moving and hazardous machinery. (R. 16.)

12

In support of this RFC determination, the ALJ wrote that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record," and that "a limited range of light and medium work . . . would fully address the claimant's complaints of fatigue and fog and needing to nap and falling asleep when sedentary." (R. 22-23.) The ALJ further found that the RFC was supported, given Plaintiff's generally good response to medication for narcolepsy with cataplexy; high BMI but lack of respiratory, cardiovascular, musculoskeletal or neurological deficits secondary to obesity; mild OSA and Dr. Attarian's testimony that the OSA did not affect Plaintiff's narcolepsy; lumbar spondylosis that was not the cause for any treatment found in the record; and recent treatment notes that pitolisant was controlling Plaintiff's narcolepsy; all coupled with Plaintiff's reports that she napped and fell asleep while sedentary but did engage in some activities of "driving, having some interaction with her son, cleaning, grocery shopping," and travel to Michigan on two occasions for family events (R. 24). Specifically, the ALJ found that:

- Plaintiff's allegations that she could not work because she falls asleep without notice and needs scheduled naps were inconsistent with her 1998 narcolepsy diagnosis, after which Plaintiff worked from 2002 to 2017 (R. 22);

- Plaintiff's symptoms were well-controlled after Plaintiff was put on Xyrem in October 2017, and Plaintiff only had occurrence of symptoms when she went off the medication "because she was trying to get pregnant" (R. 22);

- Dr. Attarian's testimony that Plaintiff had "extreme fatigue and would need multiple breaks and naps" was inconsistent with the medical evidence that Plaintiff's narcolepsy was well-controlled on pitolisant and that Dr. Attarian had not instructed Plaintiff to stop driving,

13

that Plaintiff was 60 percent better with treatment, and that Plaintiff would only fall asleep when Plaintiff was sedentary and not when she was standing up (R. 22-23);

- Dr. Attarian's testimony regarding "serious symptoms and limitations" was not documented in the treatment notes as of October 2017, and that Dr. Attarian had noted in January 2019 that Plaintiff's narcolepsy was "much better with ptolisant [sic]" and that Plaintiff told Dr. Attarian that she was "more alert" (R. 23);

- Dr. Goldstein's opinion that Plaintiff could perform "a full time job that was not sedentary because . . . if she is sitting alone and not stimulated, she would fall asleep, but if she were doing something, like driving, she would not fall asleep" was "more consistent with the treatment notes" because Plaintiff had a good response to medications and stated that Plaintiff falls asleep while sedentary, and Plaintiff drove occasionally (R. 23); and

- Plaintiff's obesity, mild OSA, and lumbar spondylosis were addressed by the RFC and postural and environmental limitations (R. 23).

Next, the ALJ explained the reasons for finding that Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were, according to the ALJ, not entirely credible. Specifically, the ALJ found that Plaintiff "was less than fully cooperative while testifying" and that Plaintiff's "responses were somewhat evasive or vague, and left the impression that the claimant may have been less than entirely candid." (R. 24.) Specifically, the ALJ took issue with Plaintiff's denial at the hearing that she was trying to get pregnant, as opposed to what the ALJ characterized as "statements she made during numerous office visits" that she was trying to conceive and thus would stop taking medications in the weeks between ovulation and her period (R. 23-24). The ALJ found that "[a]lthough the inconsistent information . . . may not be the result

14

of a conscious intention to mislead . . . the inconsistencies suggest" that Plaintiff was not entirely reliable (R. 24).

With respect to the opinion evidence, the ALJ found Dr. Attarian's opinions in his report and testimony at the hearing "not persuasive" because his opinion was contradicted by the treatment notes in the record. (R. 25). Specifically, the ALJ found Dr. Attarian's treatment notes indicating that Plaintiff's symptoms were well-controlled with medication to contradict his opinion that Plaintiff was unable to work. (R. 25). The ALJ also found that despite Plaintiff reporting cataplexy two to three times per month, as well as sleep attacks, Plaintiff was still driving. (R. 25). Additionally, the ALJ found that Dr. Attarian reported that Plaintiff was experiencing sleep hallucinations but that Plaintiff had denied having them during an October 18, 2017, office visit (R. 25).

Meanwhile, the ALJ found Dr. Goldstein's opinion persuasive because he was a neurologist "familiar with SSA policy and regulations" who had "reviewed the complete documentary record and provided a detailed explanation with references to the evidence in the record to support his opinion." (R. 25.)

The ALJ concluded by determining that Plaintiff could perform her past work as a cashier or a teacher; or alternatively, that Plaintiff could perform other jobs in the national economy that existed in significant numbers, even given the limitations of her RFC, and that therefore Plaintiff was not disabled. (R. 25-26.)

## II.    LEGAL STANDARD

An ALJ's decision will be affirmed if it was supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, ___ U.S. ___, 139 S. Ct. 1148, 1154 (2019). "Under the

substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. . . .[T]he threshold for such evidentiary sufficiency is not high." *Id*. In making this determination, the Court may "not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021).

## III.   ANALYSIS

Plaintiff makes three arguments in support of remand: (1) the ALJ improperly credited Dr. Goldstein's opinion, whose testimony was unreliable; (2) the ALJ did not give credit to the Plaintiff's statements about her condition; and (3) the ALJ did not properly assess Plaintiff's obesity when considering the RFC. (DE 17 at 7-8.) As explained below, the Court agrees that the ALJ's RFC determination was not supported by substantial evidence, and that failure requires us to remand the case.

In this case, the ALJ crafted an RFC holding that Plaintiff could perform medium and light work with a few additional postural limitations. The ALJ reviewed the medical records supporting this determination and used them to purportedly bolster the decision to credit Dr. Goldstein's opinion over Dr. Attarian's opinion and to discredit Plaintiff's testimony regarding her symptoms, but the ALJ's reliance on Dr. Goldstein's opinions and thus, ultimately, the ALJ's overall reasoning, is not supported by substantial evidence.

The ALJ accepted the conclusions offered by Dr. Goldstein over those of Plaintiff's treating physician, Dr. Attarian. Because Plaintiff filed her claim after March 27, 2017, the regulations required the ALJ to evaluate the persuasiveness of each medical opinion based on specific factors: (1) supportability; (2) consistency; (3) the medical source's relationship with the claimant; (4) specialization; (5) other factors, including the source's familiarity with other evidence

16

in the claim or an understanding of Social Security disability policies and requirements. 20 C.F.R. § 404.1520c(c)(1)-(5). The ALJ is only required to explain how the ALJ considered the first two factors – supportability and consistency – but need not explain consideration of the remaining factors. *Id.* § 404.1520c(b)(2). Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion, *id*. § 404.1520c(c)(1), and consistency concerns how a medical opinion stacks up with other evidence in the record. *Id.* § 404.1520c(c)(2).

The ALJ's reliance on Dr. Goldstein's opinion falls short of the substantial evidence standard for several reasons. As an initial matter, the ALJ relied on Dr. Goldstein's testimony that he was familiar with SSA policy and regulations. (R. 25.) But when Plaintiff's counsel asked what listings Dr. Goldstein used to evaluate Plaintiff, Dr. Goldstein testified to not seeing a listing that covered narcolepsy and to "look[ing] at . . . it would be more in the mental listings about concentration and so forth . . . I didn't see any physical listing to consider, really." (R. 71.) Plaintiff's counsel then had to direct Dr. Goldstein to SSA guidance advising that narcolepsy claimants should be evaluated using Listing 11.02. While there is no requirement to do so (POMS is an internal manual without the force of law, *see Parker*, 891 F.2d at 190), Dr. Goldstein's testimony indicated that he had never heard of it, which is counterfactual to the ALJ's stated reliance on his credentials as a medical expert familiar with SSA policy. The ALJ herself applied POMS DI 24580.005 in the opinion. (R. 16.) Had Dr. Goldstein reviewed the POMS information about narcolepsy, perhaps this doctor would have seen that many of his concerns with Dr. Attarian's treatment of Plaintiff were addressed there: that with the exception of sleep studies, laboratory studies would be normal in narcolepsy cases; that the presence of cataplexy is ordinarily sufficient to establish the existence of narcolepsy without laboratory sleep studies, and that an

electroencephalogram ("EEG") is not necessary to obtain in narcolepsy cases; and that most patients experience disturbed nocturnal sleep. The ALJ wrote that Dr. Goldstein found that the Plaintiff did not meet Listing 11.02. *Id.* But when Plaintiff's counsel directed him to the Listing at the hearing, it was the first time that Dr. Goldstein had even considered if the Plaintiff met the Listing, and he testified that ". . . if she had one of those sleep attacks and it would cause the inability to function . . . I would say that if she had enough days like that, then you could consider it under 11.02." (R. 72.) Dr. Goldstein testified there were a lack of "documented sleep attacks" in the record, and instead only "complaints." (R. 72.) But contrary to the ALJ's conclusion, Dr. Goldstein, a purported expert in Social Security regulations, did not testify definitively that Plaintiff did not meet Listing 11.02.

Additionally, the ALJ credited Dr. Goldstein's conclusion that Plaintiff's medications were changed only because of her complaints and not because of test results or a medical provider physically observing Plaintiff experiencing a sleep attack. To the contrary, the medical records extensively reflect many instances where Plaintiff's medical team adjusted her prescriptions to try to find a treatment that balanced effectiveness and side effects and worked for Plaintiff. *See*, *e.g.*, *Suess v. Colvin*, 945 F. Supp. 2d 920, 929 (N.D. Ill. 2013) (finding incorrect ALJ's determination that plaintiff's complaints about extensive side effects were not supported by the record where "records contain[ed] numerous instances where treating physicians modified prescriptions . . . in an effort to find treatment that worked and that Suess could tolerate in light of the side effects").

Moreover, the ALJ credited Dr. Goldstein's opinion on the purported ground that the doctor "had reviewed the entire medical record," but this was also an erroneous conclusion. Dr. Goldstein relied on the Epworth Sleepiness Scores that were assessed at Plaintiff's medical visits: he testified at the hearing that " . . . there was one – the best one I saw was at 12, when she was on medication.

18

And it said that if she was sitting alone and not stimulated . . . she would tend to fall asleep," and that Plaintiff's ESS scores topped out at a 20.  (R. 66).  According to Dr. Goldstein, "if you look at the best Epworth scores … [Plaintiff] had no symptoms when she was stimulated." (R. 70.)  But this does not reflect the evidence in the record: Plaintiff's ESS scores were greater than 20 (out of a possible 24 points) multiple times, including while Plaintiff was on medication.  Plaintiff scored a 22 on August 28, 2018 (R. 335), and a 22 on October 4, 2018 (R. 430).[12]  Moreover, at least one of the low scores of 12 was artificially low – a careful review of the medical records shows that the test score was improperly calculated, as discussed above, and the September 12, 2018, score was in fact 15.  (R. 422).

On the flip side, the ALJ repeatedly cherry-picked portions of Dr. Attarian's testimony and the medical records to support her decision and ignored the evidence in the record that contradicted her conclusion.  This she may not do.  *See Felicia T v. Kijakazi,* No. 22 C 792, 2023 WL 157785 at *5 (N.D. Ill. Jan. 11, 2023)*, citing Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (ALJ may not "cherry pick" evidence that supports his conclusion and ignore other evidence the contradicts it.)  For example, the ALJ dismissed Dr. Attarian's opinions, saying that the "serious symptoms and limitations reported by Dr. Attarian are not noted in the treatment notes as of October 2017," because a January 2019 progress note "revealed that the claimant's narcolepsy was much better with ptolisant [sic]." (R. 23.)[13]  But the very same progress note continues to say that

---

[12] This tolerance for Dr. Goldstein's error stands in stark contrast to the ALJ's treatment of Dr. Attarian, whose opinion the ALJ discredited because Dr. Attarian wrote that Plaintiff experienced sleep hallucinations when Plaintiff had reported at an office visit that she was not currently experiencing those symptoms.  (R. 25.)  Meanwhile, on other dates, Plaintiff reported that she was in fact experiencing those symptoms.  (R. 398), which the ALJ did not consider.

[13] Additionally, it is entirely unclear how the ALJ could conclude how an October 2017 treatment note does not mention serious symptoms by pointing to a treatment note from over a year later.

"[s]he is still needing to nap." (*Id.*) Moreover, Dr. Attarian testified at the hearing that even on pitolisant, Plaintiff was only 60 percent improved, and that the symptoms of falling asleep that were present while Plaintiff was sedentary were different from Plaintiff's mental fogginess and fatigue that were present at all times – even when standing. (R. 46-47, 49-50.) The ALJ wrote that Dr. Attarian "never recommended that the claimant give up her driver's license," but the record shows that Dr. Attarian or one of the doctors he supervised instructed Plaintiff not to drive on multiple occasions when her ESS was high. (R. 356, 388.) The ALJ also wrote that Plaintiff stopped taking Xyrem because of pregnancy[14] – but Dr. Attarian testified, and the medical records stated, that the medical team discontinued Plaintiff's Xyrem because Plaintiff found the side effects difficult to manage. (R. 420.)

Finally, the ALJ erred in finding that Plaintiff's testimony that she could not work was "inconsistent" with her diagnosis many years earlier. The ALJ noted that Plaintiff was first diagnosed with narcolepsy in 1998, but that Plaintiff was able to work for many years after that diagnosis, and so found that Plaintiff's current complaints about the severity of her symptoms were not consistent with her condition. (R. 22.) This conclusion ignores the entirely logical concept that Plaintiff's medical condition could worsen over time. Moreover, "[a] long employment history is not a proper basis to find a claimant lacks credibility. To the contrary, a lengthy work history supports a claimant's credibility." *Suess,* 945 F. Supp. 2d at 929, citing *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1104 (N.D. Ill. 1998) (criticizing ALJ's failure to consider plaintiff's 11-year

---

[14] At the hearing, the ALJ asked Dr. Attarian about the decision to remove Xyrem as one of Plaintiff's medications by asking ". . . her symptoms only recurred when she took herself off that Xyrem because she was trying to get pregnant. So there was a point of time, like around this time, when her – when she was not having any sleepiness? And what happened to the Xyrem?" (R. 48.) Dr. Attarian responded, after reviewing the medical records, that "So the reason I discontinued her Xyrem was not because she was trying to get pregnant. The reason I discontinued her Xyrem is because of side effects. . . she felt . . . knocked out. That's the reason we discontinued the Xyrem." (R. 48.)

work history as "favorable to [plaintiff's] credibility"); *see also Goins v. Colvin*, 764 F.3d 677, 679 (7th Cir. 2014) ("the fact that someone works is not a sufficient ground for concluding that she's not disabled"); *cf. Richards v. Berryhill*, 743 F. App'x 26, 30 (7th Cir. 2018) (supporting the inverse proposition to Plaintiff's situation, in that "[i]nfrequent employment before the onset date can suggest, in some circumstances, a disinclination to work rather than a disability").

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's motion to remand (D.E. 23) and denies the Commissioner's motion to affirm the ALJ opinion. (D.E. 27.)

**SO ORDERED.**

**ENTER:**

**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: March 30, 2023**

21